Filed 1/7/15  P. v. Villa CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>LUIS ADOLFO VILLA,<br><br>        Defendant and Appellant. | A137247<br><br>(San Mateo County<br>Super. Ct. No. SC71801A) |

Appellant Luis Adolfo Villa was convicted, following a jury trial, of second degree murder.  On appeal, he contends (1) the trial court erred in failing to instruct the jury sua sponte on voluntary manslaughter based on heat of passion or, in the alternative, defense counsel's failure to request such an instruction constituted ineffective assistance of counsel; (2) counsel was ineffective for failing to object on hearsay and confrontation clause grounds to admission into evidence of two packing slips showing knife purchases by appellant; and (3) his sentence of 36 years to life constituted cruel and unusual punishment under the federal and state Constitutions.  Because we conclude appellant received ineffective assistance of counsel due to his attorney's failure to object to the admission of the two packing slips on the ground of hearsay, we shall reverse the judgment.

## PROCEDURAL BACKGROUND

Appellant was charged by an amended indictment with the first degree murder of Matthew Johnson (Pen. Code, § 187, subd. (a).)[1] The indictment further alleged that appellant personally used a deadly weapon, a knife, in the commission of the offense (§ 12022, subd. (b)(1)); that he personally and intentionally inflicted great bodily injury on the victim (§ 1203.075); and (3) that he was at least 16 years old at the time of the offense (Welf. & Inst. Code, § 707, subd. (d)(1)). Finally, the indictment alleged that appellant had suffered a prior serious felony conviction for negligent discharge of a firearm (§ 246.3; § 969f), within the meaning of section 1170.12, subdivision (c)(1), and § 667, subdivision (a)(1), for which he had served a prison term (§ 667.5, subd. (b)).

On December 15, 2011, the jury found appellant guilty of second degree murder and found the related enhancement allegations true. On March 2, 2012, the trial court found the prior conviction allegations true.

On November 2, 2012, the trial court denied appellant's motion for a new trial.

On November 30, 2012, the court denied appellant's motion to strike the prior conviction allegation and sentenced appellant to a total term of 36 years to life in prison.

Also on November 30, 2012, appellant filed a notice of appeal.

## FACTUAL BACKGROUND

*Prosecution Case*

Robert S., who was 18 years old at the time of trial, testified that, approximately 1:00 a.m. on January 3, 2009, he and his friends, Matt Johnson and Steve M., stole a six-pack of Volt soda from a loading dock behind Safeway in Redwood City. The boys each drank a soda and then walked to a nearby railroad overpass, where they threw the remaining cans off the overpass toward vehicles that were driving by down below. They then began throwing rocks that were five to six inches in diameter off of the overpass at any vehicles that passed by.

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

2

When a red vehicle came toward the overpass, all three boys threw rocks at the car. Robert heard one or two loud noises as rocks hit the car. The boys ducked down, but saw the car turn left on Franklin Avenue and pass out of sight. They then ran down a hill in the direction of Franklin and hid in the corner of a vacant lot.

Robert saw a Mexican man in a gray shirt running up the hill toward them from Jefferson Street. He heard the man yell, "Hey motherfuckers. Get back here."[2] The three boys ran through a gap in the fence into a parking lot, but saw the red car parked at the dead end of Wilson Street with the doors open, so they ran down Wilson toward Franklin. Robert ran down Franklin until he got to a parking lot at the corner of Franklin and Monroe, where he saw that Steve was no longer with them. Robert and Matt hid in some bushes at the edge of the parking lot. Less than five minutes had passed since the boys had thrown the rocks. The man in the gray shirt ran to the parking lot and Robert heard him tell people in the car to make a left at Monroe. The man in the gray shirt was walking by the bush where the two boys were hiding when he must have heard Matt fall because the man called, "Gordo, they're over here." The red car stopped and Robert saw about four people get out.

The man in the gray shirt ran into the parking lot, grabbed Matt out of the bushes, threw him on the ground, and started punching him. The other three or four people had already gotten to the parking lot at that point. Robert continued to hide in the bushes, about eight feet away, while watching what was happening. He had a clear view of the attack, but he put his head down at times because he was afraid of being seen. All of the people, including the man in the gray shirt and someone in a Giants jacket who he understood to be Gordo, stood in a circle around Matt and started punching and kicking him. The man in the gray shirt was standing with his back to Robert, near Matt's knee to hip area. The other people obscured Robert's view of Matt, who was lying either on his back or his side.

---

[2] Robert did not get a good look at the face of the man in the gray shirt that night, and did not recognize him in the courtroom when he testified. In subsequent testimony, however, witnesses identified appellant as the man in the gray shirt.

Robert could see all of the attackers, including the man in the gray shirt, hunched over Matt and making "downward punching motion[s]." He could not see whether their hands made contact with Matt's body, but could see that he was being kicked. It was dark out, and Robert never saw anything in the hands of the man in the gray shirt or anyone else. Robert heard Matt yelling that he "didn't do it." He heard the men yelling, "motherfucker" and "punk." The men were saying other things as well, but Robert was not paying attention and could not specifically recall what they said. He did not hear anyone speak in Spanish during the attack and did not see "Gordo" try to keep the man in the gray shirt from attacking Matt. The beating of Matt lasted "[a] couple of seconds."

After the attack on Matt ended, the man in the gray shirt turned around, saw Robert in the bushes, and kicked him twice in the face. At that point, the other men were running out of the parking lot in the direction of the car. After kicking Robert, the man in the gray shirt started running to the car, but then came back to Matt, who had gotten to his feet. The man said to Matt, "fuck that. Give me your wallet." Robert did not notice if the man had anything in his hands. After Matt said he did not have a wallet, the man in the gray shirt turned around and ran back to the car. Robert, who had come out of the bushes, heard the car drive away. Robert believed that the entire attack took less than a minute.

Robert then walked up to Matt, who said he was bleeding. Robert saw that Matt's nose was bleeding, but Matt pointed to his ribcage and said, "he stabbed [me]." Robert put his hands on Matt's ribs and blood squired through Matt's sweatshirt onto Robert's hands. He asked Matt if he could walk. When Matt said no, Robert, who did not have a cell phone with him, threw his arm over Matt's shoulders and walked him down the street toward Safeway. Along the way, he lay Matt down on a curb and ran down the street yelling for Steve, who came out from between two buildings. Robert took Steve to Matt, who was bleeding heavily, and then ran to a nearby donut shop and called 911. A police officer came and picked up Robert, who took the officer back to where he had left Matt and Steve. The next morning, Robert learned that Matt had died.

4

Robert acknowledged that he did not tell the police that night about throwing rocks at the car. He was scared of getting in trouble and Steve was already on probation. About three days after the incident, Robert had an interview with police, at which time he told the officer that the boys had been throwing rocks before the attack occurred.

Uriel Villa,[3] who was 19 years old at the time of trial, grew up in Redwood City. Uriel described his relationship to various people involved in this case, including Jonathan Herrera, his cousin and good friend, whom he saw about every other day in 2009. Luis Herrera is Jonathan's older brother, with whom Uriel also was friends. Appellant is also Uriel's first cousin and friend. Appellant lived in Lathrop and Uriel's family visited appellant's family occasionally. He had not seen appellant for a year and a half before January 2009.

On the evening of January 3, 2009, Uriel and appellant were at Jonathan's house, watching television. Luis was working at McDonald's that night and, at some point, Jonathan drove Uriel and appellant in Jonathan's mother's Honda Civic to pick Luis up from work. Uriel was in the front passenger seat of the car and appellant was in the back seat. Appellant was wearing a gray shirt that night. When they got to McDonald's, Luis came out and got into the backseat of the car. The four of them then drove on Jefferson Street toward Safeway. As the car drove under the overpass at the railroad tracks, Uriel heard "big booms" hitting the car. Jonathan turned left on Franklin, stopped the car, and Luis, who was upset, got out of the car. Appellant got out a couple of seconds later. Luis and appellant started running toward the overpass and Uriel lost sight of them in the dark. Only 40 seconds had passed since Uriel heard the loud noise on the car.

Jonathan then drove straight on Franklin, made the first left turn onto Wilson, and drove to a dead end. After briefly getting out of the car and looking around, Jonathan drove back to Franklin, where Uriel saw some "kids" running south on Franklin, with Luis and appellant running after them. Jonathan stopped the car in the middle of the

---

[3] A number of witnesses at trial had last names in common with each other or with appellant. We shall therefore refer to those witnesses by their first names.

5

street near the corner of Franklin and Monroe, got out of the car, and ran to the sidewalk. Uriel got into the driver's seat, drove the car around the corner, and parked near some bushes.

Uriel stayed in the car. He could not see anything, but he heard yelling. He then heard appellant say loudly in Spanish, "Watch out. I'm going to stab him." Two seconds later, he heard Luis say in Spanish, "Don't do it." He then heard "a kid, like, yelling, kind of like crying," like he was in pain. Uriel who was scared, got out of the car, and said, "let's go" as he saw Jonathan, Luis, and appellant running toward the car. Jonathan got into the front passenger seat, Luis got into the backseat behind the driver, and appellant got into the backseat on the passenger side. Two or three minutes had passed since Jonathan got out of the car.

Uriel started driving to his house. On the way there, Jonathan said to appellant in an angry voice, "you stabbed me," and appellant said, "I'm sorry I'm sorry." Uriel looked in the rearview mirror and saw appellant cleaning a knife with his shirt. It was a folding knife with a three-inch blade. Appellant then said, "I stabbed him several times" in a normal voice that sounded "like he didn't care." At some point, Luis asked appellant in an angry voice, "[W]hy did you do that?" Uriel did not recall appellant's response to that question. Uriel got scared, thinking he would be in trouble for driving appellant away from the scene. He did not see either Luis or Jonathan with a knife that night.

The next day, Uriel learned from Jonathan that someone had died. He also saw that Jonathan had gotten stitches in his hand. Jonathan said that when appellant was about to stab the kid, he tried to stop appellant and got stabbed in the hand. He also said he was stabbed in the leg. Uriel later learned that the victim was Matthew Johnson, who had been a classmate of Uriel's.

Two days after the incident, Jonathan called Uriel and said he was going to Mexico. Uriel became scared that he would be charged with something because he drove home after the stabbing, and so decided to go to Mexico with Jonathan. Uriel talked to his father, Uriel Sr., about what had happened; his father was sad and started crying. Uriel Sr. drove Uriel, along with Uriel's mother and three sisters, to Southern California,

where they met up with appellant, appellant's sister Jasmine, Luis, and Jonathan. Uriel Sr. accompanied Uriel, appellant, Luis, and Jonathan across the border to Tijuana. Luis decided to return to the United States with Uriel Sr. because of his baby, but the rest of them bought plane tickets to Michoacán, where Uriel's grandmother lived. While Uriel, appellant, and Jonathan were waiting for the plane, they started talking, and appellant said he had stabbed the kid several times. Appellant sounded "like he didn't really care." Appellant said he was never going to come back from Mexico.

Two days later, when Uriel was in Uruapan, Michoacán, his parents called him and told him to come home to tell the police the truth about what had happened. Uriel therefore flew to Tijuana with Jonathan, and Uriel Sr. picked them up at the border. Uriel met with Detective Cirina in Redwood City. He told the truth about what had happened on January 3, but he did not tell Cirina about his father taking him to Mexico because he did not want to get him in trouble. He also did not tell the grand jury that it was his father who drove him to Mexico for the same reason. Soon after Uriel returned to Redwood City, appellant called him from Mexico. Uriel told him that everything was okay and he should just come back and tell the police his story. Appellant said, "no, no," and hung up the phone. Uriel was trying to help the police when he told appellant to come back because he "felt bad for the kid [who got stabbed]. Felt bad for what happened." Uriel loved all of his cousins equally. He never planned with Luis and Jonathan to frame appellant for the murder of Matthew Johnson. It was difficult for Uriel to testify against appellant, but he believed appellant should "pay for" what he did. Uriel was granted immunity for his testimony.

Luis Herrera, who was 23 years old at the time of trial, testified that he and appellant grew up together, and appellant was like a brother to him. Around 1:00 a.m. on January, 3, 2009, Luis's brother Jonathan picked him up from McDonald's, where he had been working. Jonathan was driving their mother's red Honda and Luis's cousins Uriel and appellant were with him. After picking up Luis, they were driving under an overpass on Jefferson Street on the way to Safeway when Luis heard one or two loud noises as something hit the car. He looked back at the overpass and saw people hiding behind a

7

railing.  The car stopped in the middle of the street and Luis got out.  He did not say anything when he got out of the car, and there was no discussion about attacking anyone.  Luis did not have a knife and he had not seen anyone else in the car with a knife.  Luis was upset about what had happened to his mother's car and planned to scare or fight whoever threw something at the car.

Luis went up the hill toward the overpass, saw three people running by, and chased them down Franklin Street.  When he looked back, he saw that appellant was running about 10 feet behind him.  One of the people ran to the left, but Luis continued to chase the other two to a dark parking lot near the corner of Franklin and Monroe Streets.  Luis was wearing his McDonald's uniform and appellant was wearing a gray shirt.  With appellant still running behind him, Luis arrived at the parking lot and saw "like a shadow coming out and just saying, it wasn't me."  Luis said to the person "what the fuck are you thinking?"  Luis then went up to the person and tried to punch him in the face.  The "kid" put up his hands and brushed off the punch.  Almost immediately, appellant came up and started throwing punches at the kid.  Luis then turned to some nearby bushes because he heard something move.  He saw a person hiding in the bushes, and he grabbed his shirt, trying to pull him out, but he could not get him out of the bushes.  Luis looked back and saw appellant still punching the other kid.  It was dark in the parking lot and Luis did not see anything in appellant's hand, but he saw him "swing" two or three times.

Luis then saw Jonathan run up and make a "hugging motion" with appellant, like he was pulling appellant back.  Luis also saw that the kid appellant had been punching was on the ground.  Luis still did not see anything in appellant's hand and did not hear him say anything, such as "watch out, I'm gonna stab him."  Nor did Luis recall saying, "don't do it."  The next thing Luis remembered was letting go of the kid in the bushes and walking toward the car, which was in the middle of the street.  He did not see Uriel at that point and had not seen him in the parking lot.  Jonathan got into the driver's seat and Luis was opening the rear driver's side door when he saw appellant running behind him.  But then appellant turned back and went to where the two kids were now standing on the

8

sidewalk. He heard someone scream, "no," and then saw appellant walking toward the car. He did not hear appellant say, "fuck that, give me your wallet."

Appellant got into the car and Luis got in after him and closed the door. Jonathan was in the driver's seat, Uriel was in the front passenger seat, appellant was sitting behind Uriel, and Luis was behind Jonathan. Luis asked appellant, "what the fuck you went back for" and appellant said with a smile that he went back to ask him for his wallet. Luis then noticed that appellant was holding a knife in his lap. It was dark, but the knife appeared to be a "palm-size" folding knife with the blade extended; it was three to four inches long. Luis told appellant, "you fucked up my life," and asked, "what the fuck are you doing with that?" Appellant responded, "don't worry about it. I got him in the leg." Luis, who had never been in a fight with a gun or knife, was scared because he thought appellant had stabbed somebody in the parking lot, although he did not see it happen. Luis let appellant know that he was angry, but appellant seemed like he did not care. He did not seem upset or scared; he just "sounded normal like a normal person." Luis did not see any blood on appellant's knife or on anyone's clothing. Nor did he see appellant wipe the knife on his shirt.

Jonathan then said that he had been stabbed and that his hand was burning or going numb. Jonathan also said, "around here we don't fight with knives. We don't . . . do that shit." Luis said, "around here we square up," which meant "[w]e fight with our fists."[4] At some point, after Jonathan mentioned that his hand was going numb, he stopped the car and Uriel drove to his house. Luis then drove home with Jonathan and appellant. At home, he poured hydrogen peroxide on Jonathan's hand, which was bleeding. Luis did not recall getting cut or injured during the incident. He did not see either of the kids he punched with knives or any other weapons.

Luis did not recall talking to his ex-fiancée, Janet Campos, that night about what had happened. He believed he told her about it three days later, after he read that a teen

---

[4] Luis acknowledged that he had a 2006 misdemeanor conviction for battery and a 2006 felony conviction for commercial burglary.

had been stabbed and killed for throwing rocks at a car. He felt bad when he read that and saw that the victim was only 15. He felt responsible for what happened even though he did not stab the boy because he had gotten out of the car and chased the kids. Luis did not believe the boy would be dead if he had not gotten out of the car.

Three days after the incident, when Luis found out that Jonathan was in Gilroy and planned to go to Mexico, he decided to go too. Campos took him to his aunt's house in Gilroy and, from there, he went south with appellant, Jonathan, and appellant's sister Jasmine in Jasmine's car. He had no memory of Campos traveling with him to Lathrop, but it had all happened three years earlier and it was possible that she remembered something he did not. Luis remembered going to a hotel where Uriel and his family were staying, but he had no memory of talking with Uriel Sr. about what had happened. Luis told Campos he did not want to go to Mexico because his five-month old son was there. But he decided to go because he was scared: "[E]verybody left me by myself. And that's why I got scared." He was afraid he would get in trouble because he had been in the car with the others and was on probation at the time.

Luis crossed the border into Mexico with appellant; Uriel; Uriel's father, Uriel Villa Sr.; and Luis's brother Jonathan, whom he called "Gordo." After taking the others to the airport, Luis decided not to stay in Mexico. He therefore came back across the border with Uriel Sr. and returned to Redwood City. Luis did not talk to law enforcement about what had happened because he did not want to be involved. Within a day or so of returning to Redwood City, Luis was arrested. He initially lied and did not tell the police about his involvement in the stabbing incident. Once the police said that Luis or Jonathan had been identified as having been present, Luis told them what had happened, including that he saw appellant with a knife and thought appellant had stabbed the kid. But he did not say anything about going to Mexico because he thought he could get in trouble for helping appellant flee and that he could be found guilty as an accessory. Luis was also trying to protect his family, including his uncle Uriel. He did not tell a grand jury about going to Mexico for the same reasons. More recently, Luis did not tell police that Campos drove him to Gilroy because he did not want to involve her.

10

Luis was charged with and pleaded guilty to felony assault with force likely to inflict great bodily injury.  He was sentenced to a year in county jail and was still on probation at the time of trial.  When he pleaded guilty, he was not offered anything in return for his plea.  In exchange for his testimony at appellant's trial, Luis was granted immunity; his testimony would not be used against him in a future prosecution.  It was difficult for Luis to testify against appellant, with whom he grew up and who was like a brother.  But Luis wanted "to clean my name out of it" and wanted appellant to pay for what he did.

On cross-examination, Luis testified that he did not remember telling appellant during the drive to Mexico, with Campos and appellant's sister Corina present, that appellant had messed up his life or that appellant had put his head in his hands and said, "I'm sorry, I fucked up."

Jonathan Herrera, who was 21 years old at the time of trial, testified that he grew up in Redwood City with his older brother, Luis, to whom he is close.  His cousin Uriel also lived in Redwood City, and he was close to Uriel, seeing him almost every day.  Appellant is also Jonathan's cousin, and Jonathan was close to appellant when they were young and went to the same school.  In January 2009, Jonathan had not seen appellant in about a year.  Jonathan's nickname is "Gordo."

In January 2009, appellant was visiting from Gilroy and was staying with Jonathan's family in Redwood City.  Uriel came over about 10:00 p.m. on the night of January 2, and, around 1:00 a.m. on the morning of January 3, Jonathan drove Uriel and appellant in Jonathan's mother's red Honda Civic to pick up Luis from work at McDonald's.  Appellant was wearing Jonathan's gray shirt that night.  After picking up Luis, Jonathan started driving down Jefferson Street to Safeway to get something to drink.  As he drove under the railroad overpass, he heard a popping noise.  He thought he had run over a bottle, but Luis said someone was throwing rocks.  This made Jonathan angry.  He turned left on Franklin Street and stopped the car.

Luis got out of the car and ran back toward the railroad overpass, and appellant went after him.  Jonathan tried to cut off the rock-throwers by driving down the street,

11

turning left on the next street, and driving to the dead end of Wilson. Jonathan got out of the car and saw three "kids" running, with Luis and appellant running after them. Jonathan went back to the car, turned it around, and turned left on Franklin. He had driven about two blocks when he saw Luis pointing downward, apparently at some bushes. Appellant was about 20 feet behind Luis, walking toward him. Jonathan continued to drive slowly until he heard someone screaming in pain and Uriel asked Jonathan if it was his brother. Jonathan stopped the car and got out, telling Uriel to park the car.

Jonathan went to the parking lot, where he saw Luis and appellant standing a number of feet away from Matthew Johnson, who was on the ground on his hands and knees. Appellant took off his shirt and Luis looked around, so Jonathan ran up to Matthew, planning to engage in a fistfight.[5] Jonathan grabbed Matthew to try to see his face, but he did not recognize him. He did not hit or kick Matthew. About two seconds later, while Jonathan was still holding Matthew, he heard appellant say, "watch out. I'm going to stick him," in Spanish. Jonathan, who had not seen appellant with a knife, put his left hand out and got stabbed at the base of his thumb. Jonathan jumped back and he heard Uriel, who was standing in the middle of the street, say, "let's go."

When Jonathan looked back toward Matthew, he saw Luis punching at the face of someone in the bushes, though he was not sure if Luis made contact. He also saw appellant next to Matthew, who was still on his hands and knees. He saw appellant stab Matthew three times in the left side of his stomach. Jonathan could hear Matthew screaming and also heard Luis telling appellant to stop, at which point he stopped stabbing Matthew. It was pretty dark in the parking lot, but Jonathan could see the knife in appellant's hand. Jonathan could not remember if he had grabbed appellant in a bear hug to try to stop him. Later that night, Jonathan noticed that he had also been stabbed in the left leg.

---

[5] Luis was wearing his McDonald's uniform shirt, but took it off at some point while he was in the parking lot.

Jonathan went back to the car first and got into the front passenger seat; Uriel was already in the driver's seat. Luis got into the rear driver's-side seat and appellant came partway back to the car before going back toward the parking lot. A short time later, Jonathan saw appellant running back toward the car and Matthew running down the street. Jonathan did not hear appellant tell anyone to give him a wallet before he got into the car.

Uriel started driving the cousins to his house. As they drove away from the parking lot, Jonathan saw appellant "closing something" that appeared to be a knife with a three- to four-inch blade. He also got a quick glimpse of a black and silver handle. Appellant said he had "stabbed [Matthew] hella times, and that he was crying like a little bitch." He sounded "excited, . . . like he was happy about it." Luis asked appellant "what was wrong with him. Why did he stab him." Appellant did not respond. Jonathan then said appellant had stabbed him, and appellant said he was sorry, but "that he had told me to move." After they dropped Uriel off at his house, Jonathan also told appellant, "we don't fight with knives here; we fight with our fists." Appellant did not respond. Jonathan felt responsible for what had happened because he had stopped the car after the rock throwing incident, which he never would have done if he had known that appellant had a knife.

When Jonathan, Luis, and appellant got back to Jonathan's house, Jonathan heard appellant tell Luis's girlfriend, Janet Campos, that he had stabbed someone who had jumped them. Around 2:00 a.m., Jonathan's mother took him to the hospital, even though appellant said he should not go to the hospital because the police would come and ask questions. At the hospital, Jonathan told the medical staff that he had gotten in a fight. He said he had cut his leg on concrete and cut his hand on a fence.

Early on the morning of January 3, one of appellant's sisters picked appellant up at Jonathan's house. Around noon, Jonathan learned that Matthew had died. Later that afternoon, appellant called Jonathan and, when he learned about the death, said he was going to Mexico because he did not want to go to jail for murder. When Jonathan said he did not want to go to Mexico, appellant said the police would catch him and he would be

13

"penned for murder." The next day, Jonathan talked to Luis about Matthew dying; Luis was upset and scared. Jonathan told Luis that he had talked to appellant and had decided to go to Michoacán, Mexico with him, where they had relatives. He also told Uriel about the plan to go to Mexico.

The following morning, Jonathan went to his aunt's house in Gilroy with appellant and appellant's sister, Corina, where they met up with appellant's father. While at his aunt's house, appellant asked Jonathan what clothes he had brought with him. When appellant learned that Jonathan still had the pants he was wearing at the time of the stabbing, appellant asked to see them. Appellant examined them and found a hole on the left side. Appellant then ripped the pants where the hole was and took them to the backyard, saying he was going to burn them. When Jonathan gave appellant the pants, he saw a knife in appellant's hand that looked the same as the knife he had used to stab Matthew. Appellant took the knife with him when he took Jonathan's pants to the backyard.[6] Appellant's father told Jonathan that he should not say anything about what appellant had done because appellant was like his "brother," his "family," and Jonathan said, "okay."

Jonathan's brother Luis and his girlfriend Janet Campos later came to Gilroy in their mother's red Honda. From Gilroy, Jonathan drove in the red Honda with Luis, Campos, appellant, and appellant's sister Jasmine to Lathrop, where appellant's family lived. They planned to switch cars there, since Campos was going to drive the Honda back to Redwood City. From Lathrop, Jonathan drove toward Mexico with Luis, appellant, and Jasmine in Jasmine's car. During the drive, Luis repeatedly told appellant and Jasmine "that his life was fucked up." Appellant responded that he was sorry and that he "didn't mean to." Eventually, they met up with Uriel and his father, Uriel Villa, Sr., at a gas station along Highway 5 in Southern California. They all stayed at a hotel together the next night. At the hotel, Jonathan, Luis, appellant, Uriel, and Uriel Sr. had a

---

[6] Jonathan testified that a knife he was shown at trial looked similar to the knife he had seen appellant with on the night of the stabbing and in Gilroy.

14

conversation about the stabbing. Jonathan could not remember what was said, but he knew Uriel's father was upset.

After crossing the Mexican border into Tijuana, Jonathan, Luis, Uriel, Uriel Sr., and appellant went to the airport to buy tickets to Uruapan. Luis decided to return to the United States with Uriel Sr. "for his son." Jonathan talked with appellant about what had happened, and when Jonathan asked why he had to use a knife, appellant did not really respond. He just seemed like he did not care. Everyone else was sad, but appellant seemed "happy." Once they arrived in Uruapan in Michoacán, Jonathan, Uriel, and appellant went separate ways. About five hours later, Jonathan's mother called him and said the police had arrested Luis. His mother said that if Jonathan loved her, he would come back, turn himself in to the police, and tell them what had happened. Jonathan and Uriel flew back to Tijuana and Uriel Sr. picked them up there.

Approximately eight days after the stabbing took place, Jonathan met with police in Redwood City. He did not tell the police about the trip to Mexico because he did not want to get Uriel Sr. and Jasmine in trouble. He also lied to the grand jury about how he got to Mexico because he wanted to protect his family. Later, after a defense investigator said he knew that Jonathan had lied to the grand jury, Jonathan told the police about the lies. Jonathan testified at trial under a grant of immunity. Although it was initially difficult for Jonathan to testify against appellant, it was no longer difficult because he felt appellant "deserves to be here." On cross-examination, Jonathan acknowledged that he was closer to his brother Luis and his cousin Uriel than he was to appellant.

Elida "Janet" Campos testified that, in January 2009, she was living in Redwood City at the family home of Luis, her then-boyfriend of almost six years, who was also the father of her son.[7] On the early morning of January 3, 2009, Luis and Jonathan came into Campos's bedroom and woke her up. Jonathan was bleeding from his leg and had a cut on his hand. Luis told Campos that they had heard a noise as they were driving under an

---

[7] Campos testified that, in January 2009, her relationship with Luis was "a little bit on the rocks." They had broken up over two years before trial.

overpass and saw a group of kids running away; Luis and appellant chased the boys on foot. Jonathan said that he and Uriel stayed in the car and planned to block the kids with the car. Luis told Campos that both he and appellant were fighting the boys and that appellant "pulled out a knife and started stabbing one of the boys." Both Luis and Jonathan were upset and said they had been unaware that appellant had a knife. Luis seemed "shocked" and Jonathan sounded "worried." Jonathan said he got out of the car and "got in between" appellant and the boy. "And he put his hands up and was questioning him, what are you doing? What are you doing?" Jonathan also said "he stood in the way when the stabbing was going on," and that was how he was injured. Luis said he was hitting one of the kids when Jonathan got stabbed. They told her they drove away from the scene after that. After they had finished discussing what had happened, appellant came and stood near the door of Campos's bedroom.

After the conversation with Luis and Jonathan, Campos woke up Irma Villa, Luis and Jonathan's mother, and told her that Jonathan was injured. Irma then took Jonathan to the hospital. Later that day, Jonathan told Campos that the boy who was stabbed had died. Soon after the incident, Jonathan and Luis started talking about going to Mexico. A couple of days later, Campos accompanied Luis, Jonathan, appellant, and appellant's sister Corina on a drive to Lathrop, where appellant lived, so that appellant could pick up some clothes for the trip to Mexico. They drove Irma Herrera's red Honda. Campos did not remember if they went to Gilroy before heading to Lathrop.

As they drove, all of the people in the car talked about the stabbing. Campos, who was sitting in the backseat between Luis and appellant, heard Luis ask appellant, "Why did you do it?" Luis also told him, "you fucked us over. You fucked us over." Luis sounded angry and "stressed out." Appellant put his hands on his head and looked down; he also sounded stressed when he said, "I know I fucked up. I fucked up." Campos did not recall if appellant ever said anything specifically about the stabbing, but he never denied stabbing the victim. While they were in Lathrop, Campos heard appellant, his mother, his father, and his two sisters discuss burning appellant's clothes.

16

After Campos, Luis, Jonathan, appellant, and Corina left Lathrop in the red Honda and headed south on Highway Five, Campos decided she did not want to be involved and did not want to go to Mexico with Luis. She also tried to talk Luis out of going to Mexico. She told him that if he did nothing wrong, he should not be worried. He said he thought he would be in trouble because he did not come forward and speak to the police about what had happened. After Campos said she did not want to be involved, they returned to Lathrop, and Campos drove back to Redwood City in the red Honda. She later spoke to Luis on the telephone and told him that if he went to Mexico, it would be the end of their relationship and he would not see his son again. He eventually told her he had decided not to go to Mexico.

One or two days later, Luis returned to Redwood City. He did not go the police and hoped that he would not be identified as having been involved. A few days after he returned, police officers came to the house with a search warrant. Campos went to the police station to give a statement. When the police asked if she knew anything about whether Luis was involved in the stabbing, she said no because she did not want to get involved and did not want Luis to go to jail. She was also concerned that she could be arrested for being in the car with Luis and the others. Campos also lied to police about not seeing Jonathan on the night of the stabbing.

After Luis was arrested and while he was in jail, Campos's relationship with him ended and she moved away. Since then, Campos had had very little contact with Luis. She felt their relationship ended badly and she would not lie for him. She had a restraining order against Luis and did not want him in her or her son's life. Campos had no problems with appellant before the stabbing. She testified at trial under a grant of immunity.

On cross-examination, Campos acknowledged that one reason she initially lied to police about Luis's involvement in the stabbing was because she was worried that she would not receive financial support if Luis went to jail. She also testified that the statements Luis and appellant made about the stabbing in the car on the way to Lathrop were said loud enough for everyone in the car to hear. Campos recalled telling the

17

defense investigator that, while in the car on the way to Lathrop, she heard Luis tell appellant, "Thank you for fucking up my life. Because of you I will never have a normal life." She also told the investigator that Jonathan said, "What were you thinking" and "what was going through your head?" She had further said that appellant responded, "My bad. I fucked up." She also told the defense investigator that the conversation was conducted in both English and Spanish.

Uriel Villa Carbajal Sr., Uriel's father and the uncle of appellant, Luis, and Jonathan, testified that even though he saw Jonathan and Luis more regularly than he saw appellant, he loved all three of his nephews equally. His family, including Uriel, visited appellant's family in Lathrop two or three times a month before the stabbing occurred.

A few days after the stabbing incident, Uriel told Uriel Sr. about chasing the kids who had thrown rocks at their car and about reading in the newspaper that one of the kids had died. Uriel Sr. was afraid that his son could be arrested, so he decided to send him to stay with his grandmother in Michoacán, Mexico.

Uriel Sr. drove Uriel to Southern California, where they met up with appellant, Luis, Jonathan, and Jasmine at a hotel. Uriel Sr. was in the room when Luis, Jonathan, and appellant were talking about the stabbing. He heard Luis and Jonathan say that appellant had used a knife; appellant did not say anything in response. Jonathan also said that when he tried to hold appellant so that he would not stab the boy they were fighting, appellant accidentally stabbed Jonathan. Appellant did not respond to that statement either. Appellant told Uriel Sr. that he had tossed the knife on the freeway. During the conversation, both Luis and Jonathan admitted to punching or kicking someone during the fight.

Uriel Sr. accompanied, Uriel, appellant, Luis, and Jonathan to the airport in Tijuana, and then he and Luis returned to California together. Luis said he had decided not to go to Michoacán because he "had a problem with his son and about his probation." He also said he did not feel guilty because he had not stabbed anyone, and said again that it was appellant who had stabbed the boy. Uriel Sr. dropped Luis off in Los Angeles and appellant's sister Jasmine drove Luis back to the Bay Area.

18

Police contacted Uriel Sr. the day he returned to Redwood City. He spoke to Detective Cirina, and told him that he had driven Uriel to Mexico. Cirina said that Uriel needed to return from Mexico because he was an important witness to the stabbing. Uriel Sr. did not tell Cirina in that first meeting that he had spoken with appellant, Luis, and Jonathan about the stabbing because he did not want to get the family in trouble. Uriel Sr. was testifying under a grant of immunity, so that he would not be prosecuted for lying to police or driving to Mexico.

On January 7, 2009, police executed a search warrant at Luis and Jonathan's residence in Redwood City. They found a blue McDonald's shirt, which appeared to have been worn, in a dirty clothes hamper in Luis's bedroom. They also found a pair of black pants and a pair of black shoes in the bedroom. The only folding knife found at the residence was a small Husky box cutter-type knife in another part of the residence. Police also located a maroon or red 2006 Honda Civic automobile parked in the driveway of the residence. Laboratory analysis of the clothes and shoes was negative for blood. Laboratory analysis of the Husky box cutter-type knife was also negative for blood.

On January 8, 2009, police executed another search warrant at appellant's residence in Lathrop. In the living room closet, police found two cardboard boxes with packing slips for knives inside of them.[8] Both packing slips were addressed to appellant at his residence in Lathrop. One on them, dated November 24, 2008, reflected that the knife came from "Save Some Bucks" at an address in Nashua New Hampshire. The packing slip described the item shipped as a "Gribtilian, Zytel, Satin, drop-point plain," which is a type of knife. The other packing, dated November 18, 2008, reflected that the knife had come from "JEL Enterprises" at an address in Knoxville, Tennessee. It described the item shipped as a Pocket Bushman, stainless handle, plain," which is also a

---

[8] The packing slips were sometimes referred to as "receipts" at trial.

19

type of knife.  Neither knife was found at appellant's home.[9]  Nor was any bloody clothing found there.

Pathologist Peter Alfred Benson performed an autopsy on Matthew Johnson on January 4, 2009.  Matthew died of multiple stab wounds that resulted in massive blood loss.  Wound "A," which entered the right side of Matthew's chest and punctured his right lung, was 24 millimeters in length.[10]  Wound "B" entered the right side of the chest and was 40 millimeters long.  Wound "C" to the back of the right shoulder was either 18 or 25 millimeters in length.[11]  Wound "D" was located on the back of the left thigh and was 22 millimeters in length.  All four wounds were at least three inches deep and were consistent with use of a single-edge knife blade.  There were also superficial puncture wounds to Matthew's left kneecap and scattered minor injuries to skin surfaces, which were consistent with bruising.

Dr. Benson testified that "Defense Exhibit II," a black-handled "Benchmade" knife with a single-edge blade that was 28 millimeters wide and 40 millimeters long could not be eliminated as the knife used to inflict Matthew's stab wounds.  Another knife, also identified as Defense Exhibit II, was a "Bushman" knife that measured 26 or 27 millimeters wide and four inches long.  This knife also could not be eliminated as the knife used to inflict Matthew's stab wounds.[12]

According to Dr. Benson, these knife blades could not be eliminated from inflicting the smaller wound in Matthew's shoulder because "[t]here is elasticity in skin and subcutaneous tissues that allows it to stretch and contract.  So, it is well-known in forensic pathology that the wounds made in the skin by instruments or weapons does not

---

[9]  In addition, as we shall discuss, *post*, although three other folding knives were found at the residence, the trial court excluded those knives from evidence.

[10]  Dr. Benson explained that, by "length," he was describing the wound's length from right to left on the victim's body.

[11]  Dr. Benson was not sure which measurement was correct because his diagram showed both measurements and he could not recall which one was accurate.

[12]  Both of these knives were apparently obtained and introduced by the defense to replicate the two knives described in the packing slips.

20

correlate well with the weapon that made it [*sic*]. The dimensions can vary. The skin wound can be smaller. It can be the same size. Or it could be larger. [¶] And the same thing is true of depth of stab wounds. The depth can be the same as a knife blade or deeper or more shallow." Dr Benson further explained that there is "considerable distortion" in the human body after death and medical treatment, which can be caused by "the presence of extra fluid and blood within the tissues that have been damaged, or fluid from treatment, or else there's distortion from suturing and stapling of the wounds." In this case, the victim's tissues had been distorted by the surgeons' efforts to resuscitate him, by the addition of a massive amount of fluid to the tissues, as well as by air in the tissue around the right shoulder in particular.

On cross-examination, Dr. Benson further explained that, while it was "counterintuitive," he would not agree that it was "highly unlikely" that a blade that was 27 to 28 millimeters wide could cause a wound that was only 18 millimeters long. He acknowledged that he had testified in the past that a blade that was 25 millimeters wide could not have produced a wound that was 15 millimeters long. He had retracted that opinion during subsequent testimony in that same case after he reexamined the wound using a template of the knife blade and "was stunned to find" that the wider blade fit into the narrower wound. Dr. Benson learned from that experience that "I have to be more cautious in saying what kind of wound can be made by what kind of knife and relating the size of the wound in the skin to the size of the knives."

Criminalist Christina Richardson testified that she had inspected Irma Herrera's Honda Civic and found a five-inch scratch on the left rear door and a dent on the right side near the wheel well. She also examined the inside of the car, looking for possible blood stains. A number of stains found in the car tested negative for the presence of blood. There was, however, a reddish-brown stain on the interior rear driver's side door of the car that tested positive for blood.

Criminalist Annie Ouzounian performed a DNA analysis on a sample from the blood stain, and learned that the sample contained DNA from at least two people, including Matthew Johnson and Luis. Luis was the major contributor to the DNA profile

21

in the sample and Matthew was a minor contributor. Ouzounian was able to exclude Jonathan, Uriel, and appellant as possible contributors to the sample. A "presumptive test" showed that there was blood in the sample, but it was not possible to determine whether the blood was from Matthew or Luis, whose DNA was deposited on the door pocket first, or when the DNA was left there. Nor was it possible to ascertain the source of the non-blood DNA, including whether it was from skin cells, oil from hair, sweat, or saliva. Finally, unless it is cleaned off, a person's DNA can stay on an item for an indefinite period of time.

Detective David Cirina, a police officer with the city of Redwood City, testified that he received two anonymous tips regarding Luis, Jonathan, and appellant's involvement in the stabbing of Matthew Johnson. After he was arrested on January 7, 2009, Luis provided a statement in which he initially denied involvement in the incident. After he was told that he had been identified as a suspect, Luis admitted his involvement and identified appellant as the person who had stabbed the victim. He also verified that both Jonathan and Uriel were involved. Also on January 7, Cirina visually examined Luis and saw that he had no injuries to his arms, hands, face, or neck.

Irma Villa told Cirina that Jonathan and Uriel were in Mexico and, on January 7, 2009, Jonathan called Cirina, told him that he wanted to turn himself in, and said he would return as soon as he could. Cirina did not make Jonathan any promises. On January 13, Cirina met with Jonathan, who told him that it was appellant who had stabbed both Jonathan and Matthew. After taking Jonathan's statement, Cirina told Jonathan to have Uriel call him. He did not recall if he told Jonathan not to discuss the case with Uriel or Luis. Uriel arrived at the police station about an hour and a half later. He identified appellant as the person he saw in the backseat of the car with a knife, and said appellant admitted to stabbing Matthew.

Shortly thereafter, Cirina learned of appellant's location in Mexico, and he forwarded that information to federal authorities. He also learned that appellant had called Uriel, who said, "hey, why don't you come back. Everything is okay with the police. You just need to tell the truth." Appellant responded by hanging up on Uriel.

The parties stipulated that appellant was arrested in Uruapan, Michoacán, Mexico on July 28, 2009, where he remained until he was returned to the United States in July 2010. The stabbing took place less than a month before appellant's 18th birthday.

On February 22, 2011, Jonathan told Cirina that he had lied to him and the grand jury about going to Mexico and about how he got there, in order to protect his family members. Luis also admitted that he had lied to the grand jury about fleeing to Mexico because he thought he would get in trouble for doing so. The knife used in the stabbing was never recovered.

On cross-examination, Cirina explained that he did not obtain a buccal swab from Luis before he was convicted of felony assault because Cirina "would expect his DNA to be all over his mother's car," and because he did not have any reason to believe that the blood spot in the vehicle was Luis's, since Luis had no injuries when Cirina examined him shortly after the incident. Cirina did not learn that there was a mixture of DNA in the bloodstain in the car until after Luis was sentenced. Cirina also acknowledged that all jail inmates' phone calls are recorded, but he never checked the recordings made of Luis's phone calls while he was in custody to see if he was in contact with any other witnesses in this case. Cirina further acknowledged that he told Jonathan during his initial interview that he believed "that you and your brother were put in a very difficult situation, and I think something happened that you weren't expecting. But I need you to tell me about that." Cirina remembered telling Jonathan and Uriel not to discuss their statements with anyone, and they independently responded that they did not like talking about the case because they wanted to forget the fact "that their cousin had killed a 15-year-old kid." Cirina did not have concerns about the honesty of Luis, Jonathan, and Uriel, even though they lied about going to Mexico, because their statements about the events surrounding the stabbing incident were consistent. Cirina believed "that they were honest about those circumstances then and were today."

On redirect examination, Cirina testified that the fact that Luis, Jonathan, and Uriel had quickly and voluntarily returned to the United States from Mexico, while

23

appellant never voluntarily returned, was a "very large factor" in his believing what Luis, Jonathan, and Uriel had told him about appellant stabbing Matthew.

***Defense Case***

Nora Rudin, a forensic DNA consultant, testified as an expert in the field of forensic DNA science. Rudin had analyzed the blood stain found inside the red Honda on the rear driver's-side door. Luis was the major DNA contributor and Matthew Johnson was the minor DNA contributor to that stain. Although contact DNA from Luis was found in other locations in his family's car, such as on the door handles, there was so much more of his DNA in the blood stain on the door than in the other locations that it was likely that the stain included his blood.

Dr. Terri Haddix, who testified as an expert in the area of forensic pathology, had reviewed Dr. Benson's autopsy report. Dr Haddix had also examined the two knives that were replicas of those listed on the packing slips found in appellant's house. In her opinion, it was highly unlikely that either of the two knives could have produced the wound on Matthew's shoulder because that wound was only 17 to 18 millimeters long while the width of the blades of both knives was 27 or 28 millimeters. Although she could not completely eliminate the possibility that the wider knives could have caused the smaller shoulder wound, skin elasticity of 10 millimeters in a stab wound is more than she would expect.

Detective Edward Feeney, who was assigned to assist Detective Cirina in this matter, interviewed Luis on January 7, 2009. Initially, Luis lied about his involvement in the January 3 incident, saying he rode his bike to work at McDonald's that night, and then rode his bike home and went to sleep. Feeney told Luis that the police had pictures of him and others, including the victim, and pictures of his mother's car from surveillance cameras. Feeney also told Luis, inter alia, that "the family members already called us, okay, telling us that you, your brother and another guy, Luis, were at the scene. Okay? So what's going to happen is you're going to get yourself in a lot of trouble for something you probably didn't do. Okay? So you need to come clean and tell us what happened that night and how it went down. . . . And all the information we have about

24

someone stabbing some guy was not you, and it was not your brother.' " Feeney also said he knew Jonathan had tried to stop the stabbing and had gotten stabbed himself. Feeney testified that he was not concerned that giving Luis so much information about the case might allow him to tailor his story to that information because "[t]here was no specifics of the investigation within that phrase." Luis then said, " 'I got too much to lose. I ain't trying to do time for nobody, man. I got two fucking jobs because I got—' " Luis then told Feeney that it was appellant who stabbed Matthew.[13] Luis never told Feeney that he had gone to Mexico after the stabbing.

Karina Villa-Cruz,[14] appellant's sister, testified that she was a passenger in the red Honda with appellant, Luis, Jonathan, and Campos while they were driving from Gilroy to Lathrop in January 2009. During that drive, Luis made no accusations against appellant and appellant never said anything like, "I'm sorry. I really fucked up." During the ride, the cousins were talking about what they were going to do and where they were going to work once they got to Mexico.

Robert S. testified that he believed the shoes of the person who kicked him were black and white on top, but he was certain that the soles were all white. From surveillance photographs, Robert could see that the man in the gray shirt was wearing shoes that were at least mostly white, while the man in the McDonald's shirt was wearing shoes that appeared to be all black.

Richard Dickerson, a defense investigator, testified that he had interviewed various witnesses in this case, including Luis, Jonathan, Janet Campos, Corina Villa, and Jasmine Villa (appellant's other sister). According to Dickerson, Corina had told him that Irma Villa, Luis and Jonathan's mother, had told her during a phone conversation that "Tonito" (Luis's nickname) "got someone." Irma Villa never said anything to

---

[13] Luis initially told Feeney he did not know appellant's last name.

[14] Karina Villa is at times referred to as "Corina" in the reporter's transcript and this opinion.

Corina to implicate appellant.[15]  Dickerson testified that it was difficult for him to remember the various statements he took during the interview process because "they've changed so often and there's been so many different versions of the same event."

## DISCUSSION

### *Defense Counsel's Failure to Object On Hearsay and Confrontation Clause Grounds to the Admission into Evidence of the Two Packing Slips*

Appellant contends defense counsel was ineffective for failing to object on hearsay and confrontation clause grounds to admission into evidence of the two packing slips that showed knife purchases by appellant.

### I. *Trial Court Background*

Before trial, appellant moved to exclude all evidence of his prior ownership or use of knives, pursuant to Evidence Code sections 352 and 1101.

At a hearing on the motion, defense counsel first argued that there was no evidence that three folding knives found in appellant's residence either belonged to him or were used in the stabbing of Matthew Johnson.  As to the two packing slips found in his residence, they were both addressed to appellant and dated less than two months before the stabbing.  However, since the two knives themselves were never found, counsel argued that the packing slips should be excluded as propensity evidence under Evidence Code section 1101 and as unduly prejudicial under Evidence Code section 352.

The trial court granted appellant's motion with respect to the three knives found in his residence, finding there was "very little probative value, and substantial prejudice attached to those."  With respect to the two packing slips, however, the court denied the motion, explaining:

"With respect to the missing knives, the court takes a different position.  [¶]  The missing knives, at least one of which was similar in length, similar in blade—in the type

---

[15]  The defense also called Irma Herrera, who denied telling Corina that Tonito "got someone."  She further testified that her sons and appellant had told her they were in a fight, but did not initially tell her that someone had been stabbed.  The following day, both Jonathan and Luis told her that appellant had stabbed someone during the fight.

26

of blade, and similar in color as the knife which I assume is going to be testified to by the people in the car with the defendant on the night of the crime, and is, if believed by the jury to be true, then could be circumstantial evidence that the defendant possessed that type of knife on the evening in question.

"The strength of that circumstantial evidence, however, is subject to the credibility of the witnesses that will be testifying about those particular facts, including also the representation that the defendant asked for another witness's—another person's clothing that was involved, and somehow destroyed that clothing, which further suggests that the missing knife was also disposed of by the defendant.

"The court finds that the probative value of that evidence outweighs the prejudicial effect. [¶] And this is a situation, unlike the recovered knives, where the jury is not being asked to speculate, but rather the jury could draw a reasonable conclusion from the circumstantial evidence that the defendant possessed a knife on the date in question.

"And I will preclude [c]ounsel from arguing anything close to the propensity argument. That is specifically excluded. [¶] And I will allow the evidence about the missing knives."

## II. *Legal Analysis*

Appellant argues that the packing slips constituted express hearsay because they stated that the two knives were shipped from the two companies to appellant and also constituted implied hearsay because they effectively stated that appellant ordered and received the knives. According to appellant, in the absence of foundational testimony from an employee at each of the two companies that the packing slips were valid business records and that the knives were shipped as claimed, the packing slips were inadmissible at trial. He also argues that the packing slips were "testimonial" and that their admission therefore violated his Sixth Amendment right to confrontation. Appellant acknowledges that he did not object in the trial court on either hearsay or confrontation clause grounds. He maintains, however, that defense counsel's failure to object on the proper grounds constituted ineffective assistance of counsel.

27

To prove ineffective assistance of counsel, a defendant must show that "counsel's representation fell below an objective standard of reasonableness . . . [¶] . . . under prevailing professional norms." (*Strickland v. Washington* (1984) 466 U.S. 668, 688 (*Strickland*).) In addition, the defendant must affirmatively establish prejudice by showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Id*. at p. 694.) "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." (*Id*. at p. 697.)

We do not agree with appellant that the packing slips were testimonial, pursuant to *Crawford v. Washington* (2004) 541 U.S. 36, 53-54, which held that the confrontation clause bars admission of a testimonial statement against a criminal defendant unless the declarant is unavailable at trial and the defendant has had a prior opportunity to cross-examine the declarant. In *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305, 324, our high court further explained: "Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial." (See also *People v. Cage* (2007) 40 Cal.4th 965, 984 [explaining that "confrontation clause is concerned solely with hearsay statements that are testimonial, in that they are out-of-court analogs, in purpose and form, of the testimony given by witnesses at trial"].) Here, the packing slips, apparently prepared in the course of business, were clearly *not* primarily intended "to establish or prove some past fact for possible use in a criminal trial." (*Ibid*.) Hence, their admission at trial did not violate the confrontation clause.

We do, however, agree with appellant that the packing slips were hearsay and were inadmissible to prove that the two knives were sent to appellant "absent a foundational showing of an exception to the hearsay rule." (*In re Leanna W.* (2004) 120 Cal.App.4th 735, 743 [a cable television invoice was hearsay and therefore inadmissible in minor's burglary trial to demonstrate that she had ordered a boxing match and adult

28

movies at an unauthorized party at her grandmother's house], citing *Pacific Gas & E. Co. v. G.W. Thomas Drayage etc. Co.* (1968) 69 Cal.2d 33, 42-43 ["Since invoices, bills, and receipts for repairs are hearsay, they are inadmissible independently to prove that liability for the repairs was incurred, that payment was made, or that the charges were reasonable"]; see also *People v. Zavala* (2013) 216 Cal.App.4th 242, 246 [" ' "Whether a particular business record is admissible as an exception to the hearsay rule . . . depends upon the 'trustworthiness' of such evidence, a determination that must be made, case by case, from the circumstances surrounding the making of the record." [Citations.]' "].) In this case, that foundational showing would have required, at a minimum, that "[t]he custodian or other qualified witness testif[y] to [each packing slip's] identity and the mode of its preparation," pursuant to section 1271 of the Evidence Code.[16] Respondent does not argue otherwise.

Respondent does argue that the reason counsel failed to object on hearsay grounds "is readily apparent. A successful hearsay objection would simply have prompted the prosecution to call the custodian of records for the two companies, drawing further attention to the receipts. Unlike the two objections made by the defense . . . , which if successful, would have resulted in an absolute bar to the evidence, a successful hearsay objection would simply have required the prosecution to undertake an additional procedural step to admit the documents." Respondent asserts that counsel had a tactical reason for not objecting on this basis because, had he done so, "the prosecution would

---

[16] Evidence Code section 1271 provides in full: "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered to prove the act, condition, or event if:

"(a) The writing was made in the regular course of a business;

"(b) The writing was made at or near the time of the act, condition, or event;

"(c) The custodian or other qualified witness testifies to its identity and the mode of its preparation; and

"(d) The sources of information and method and time of preparation were such as to indicate its trustworthiness."

29

merely have produced the proper foundation to establish that the receipts were admissible under the business record exception to the hearsay rule."

We agree with appellant that there was no tactical reason for defense counsel to choose not to make a pretrial objection on the meritorious ground of hearsay, but instead to object solely pursuant to Evidence Code sections 352 and 1101. (See *Strickland*, *supra*, 466 U.S. at p. 688.) First, any added harm to appellant from drawing additional attention to the packing slips, when compared with the value to the defense case of even possibly keeping out this extremely harmful evidence pursuant to a successful hearsay objection, would have been de minimis. Moreover, it is simply speculation to assume that the prosecution would have been able to obtain the needed testimony of the custodian of records for either of these entities to authenticate the documents as business records. (See Evid. Code, § 1271.)

One of the companies, "Save Some Bucks" had an address in Nashau, New Hampshire and the other, "JEL Enterprises," had an address in Knoxville, Tennessee. At the time of trial, there was no reason to assume that these were even legitimate companies or, if so, that they were currently in business three years after the dates shown on the packing slips. Moreover, even assuming these two companies still in fact existed, there was no showing that the prosecution would have been willing to pay to transport the custodians of records across the country or, if so, that it would have been able to find and subpoena the two necessary employees and get them to California to testify before the trial ended. Had defense counsel objected on the correct ground of hearsay, the prosecution would have been required to attempt to obtain the needed testimony, which would not necessarily be an easy task in this situation. Given all of these circumstances, there is no reasonable explanation as to why defense counsel did not object on the ground of hearsay, and appellant has satisfied the first prong of the *Strickland* test for ineffective assistance of counsel. (See *Strickland*, *supra*, 466 U.S. at p. 688.)

This leaves the question of prejudice. (See *Strickland*, *supra*, 466 U.S. at p. 694.)

While it is true that Luis, Jonathan, and Uriel all testified that it was appellant who stabbed Matthew, they were not disinterested witnesses. These three young men were

30

admittedly very close and saw each other regularly, whereas they spent little time with appellant, who did not live nearby. This could have given them a motive to blame appellant for the stabbing to protect, not only themselves, but also each other. They all were involved in the incident that resulted in Matthew's death; they all fled to Mexico, along with appellant; and they all lied to the police, as well as to the grand jury. All three testified under a grant of immunity.

Specifically, as to Luis, the evidence presented at trial showed that he initially lied to police about his involvement in the crime. It was not until Detective Feeney said that he knew that both Luis and his brother were present when the killing occurred and that neither Luis nor Jonathan had actually done the stabbing, that Luis admitted to his, Jonathan's, and Uriel's involvement in the crime, but claimed that appellant had stabbed Matthew. Luis also lied to the police and the grand jury about fleeing to Mexico, and testified that he had lied due to his fear of getting himself or his family in trouble. He ultimately pleaded guilty to felony assault with force likely to inflict great bodily injury and was sentenced to only one year in jail. Not until after Luis was convicted and sentenced for the assault was the blood stain found in the Honda tested, at which point it was learned that a significant amount of his DNA was present in the stain, mixed with a lesser amount of Matthew's DNA. The stain did not include any of appellant's DNA.

In addition, not until after Luis changed his story, admitting to police that he was involved in the attack and blaming appellant for Matthew's death, did Jonathan and Uriel return from Mexico and also implicate appellant in the stabbing. As Detective Cirina acknowledged, both Jonathan and Uriel had the opportunity to talk to Luis by telephone at the county jail between January 7, 2009, when Luis gave Cirina his statement and was arrested, and January 13, 2009, when Jonathan and Uriel gave their statements. Jonathan and Uriel similarly had an opportunity to discuss the case after Jonathan's police interview and before Uriel's interview. Also, like Luis, Jonathan and Uriel did not initially tell police about their flight to Mexico and both of them also lied to the grand jury, to protect themselves from being charged with a crime.

31

Moreover, neither Janet Campos, the mother of Luis's son, nor Uriel Villa Sr., Uriel's father, were completely disinterested witnesses, and both testified under grants of immunity. Campos initially lied to police about her knowledge of the stabbing. She admitted at trial that she had lied to protect Luis, the father of her child, and that she was worried she would not get financial support if Luis went to jail. Campos also lied to police about accompanying the cousins for part of the trip to Mexico because she was concerned about being arrested herself for being in the car with them. Uriel Sr. testified that he decided to send Uriel to Mexico because he was afraid that Uriel could be arrested. Uriel Sr. admitted that he did not initially tell police that he had spoken with appellant, Luis, and Jonathan about the stabbing because he did not want to get any family members in trouble. But for the grant of immunity, Uriel Sr. would have been vulnerable to prosecution, both for lying to police about his knowledge of the stabbing and for driving the cousins to Mexico.

In short, all five of these witnesses, who seemingly had closer relationships with each other than with appellant, admitted to lying about something related to the incident and all of them testified under a grant of immunity. They also had the opportunity to confer and agree to implicate appellant after Luis gave his statement to police. Moreover, there were certain inconsistencies in their descriptions of what occurred and what was said, all of which had a bearing on their credibility. Thus, the testimony of each of these witnesses pointing to appellant as the person who stabbed Matthew was vulnerable to allegations of fabrication. As defense counsel argued, "the witnesses in this case, all but Bobby S[.], the witnesses who all testified under immunity, Luis Herrera, Jonathan Herrera, Uriel Villa, Uriel Villa, Sr., Janet Campos, they all had more than one reason to lie. They all had biases. They all had reason to stick to the story that it was Mr. Villa that stabbed . . . Matthew Johnson."

It is notable that Robert S., the only eyewitness who had absolutely no motive to lie about the attack on Matthew, testified that all of the men involved in the attack were punching and kicking Matthew and that he did not see anyone with a knife. Nor did he see or hear anyone trying to stop the stabbing. Robert also testified that the man in the

32

gray shirt (appellant) arrived first and pulled Matthew out of the bushes and later kicked Robert where he was hiding in the bushes; he remembered the white soles of the man's shoes. Luis, on the other hand, testified that he was the first one to reach Matthew, and both he and Jonathan testified that it was Luis, not appellant, who subsequently turned to Robert and tried to punch, not kick, him.

It is of course quite possible that each of these witnesses was telling the truth about the stabbing, to the best of their recollection. Indeed, Detective Cirina testified that he believed Luis's, Jonathan's, and Uriel's accounts because they all returned voluntarily from Mexico, while appellant remained there until his arrest. The question we must answer, however, is not whether there was *any* viable evidence of appellant's guilt presented at trial. Rather, the question is whether, without the packing slip evidence, it is reasonably probable that concerns about the veracity of these witnesses' testimony, together with evidence showing that Luis's DNA was found mixed with Matthew's DNA, would have led the jury to find a reasonable doubt about appellant's guilt.

As appellant points out, "the packing slips were crucial, because they were the only objective evidence which linked Appellant with this crime." In addition to the packing slips themselves and the police testimony that they were found inside of empty boxes in a closet in appellant's house, other evidence flowing from the packing slips included the replicas of the knives introduced by the defense at trial, one of which Jonathan identified as looking similar to the knife he had seen appellant holding on both the night of the stabbing and later in Gilroy. Uriel and Luis also testified that they saw appellant with a three- to four-inch folding knife just after the attack. Without this circumstantial evidence of appellant's guilt, there would have been no evidence to corroborate the interested witnesses' testimony that he was the killer. The packing slip evidence, which informed the jury that appellant had obtained two folding knives shortly before the stabbing, which, according to the witness testimony, were similar to the knife he used to stab Matthew, thus was central to the prosecution's case.

Also, both the prosecution and defense presented extensive witnesses testimony about Matthew's wounds and the two knives. The pathologists agreed that at least three

of his four stab wounds could have been caused by either of the knives. They only disagreed as to whether the smaller injury to Matthew's shoulder could have been caused by the wider blade. Indeed, Dr. Haddix, the defense expert, acknowledged that, although it was highly unlikely, she could not completely eliminate the possibility that one of the two knives had caused the smaller wound.

Respondent points out that Dr. Haddix's testimony that neither of the knives described on the packing slip could have caused Matthew's shoulder wound allowed defense counsel to then argue that the knives listed on the packing slips were too wide to have been used in the stabbing. Respondent seems to be claiming that the packing slip evidence was in fact helpful to appellant in that it "permitted defense counsel to argue that appellant was not the killer." Respondent points out that defense counsel relied on Dr. Haddix's testimony in closing argument when he stated that "this circumstantial evidence of my client purchasing knives by mail, and these knives possibly fitting the wound, is grasping at straws."

That the defense presented expert medical evidence in an effort to counter the prosecution's damning evidence related to the two missing knives does not negate prejudice, as respondent argues. When compared to the prosecution evidence introduced on this subject, including the two packing slips themselves, eyewitness testimony that the knife appellant used in the stabbing looked similar to at least one of the knives described on the packing slips, as well as the testimony of Dr. Benson that the knives listed on the packing slip could have caused all of Matthew's wounds, Dr. Haddix's testimony attempting to cast doubt on the prosecution evidence, which plainly would not have been necessary absent the admission of the packing slips, could not have erased the damage caused by the prosecution's evidence and argument. (Cf. *People v. Venegas* (1998) 18 Cal.4th 47, 94 [" 'An attempt to attack the merits of damaging testimony to which a party

has unsuccessfully objected has long been recognized as a necessary and proper trial tactic, and it may not be deemed a waiver of a continuing objection' "].)[17]

Appellant also observes that the prosecutor repeatedly brought up the packing slips with the jury during closing argument, including four times during his initial closing argument and three times during his rebuttal. For example, during his initial closing argument, the prosecutor said, "Then, lastly, you also have the knife receipts from Lathrop addressed specifically to Luis Villa, for two different weapons that you've seen [replicas of] multiple times, either of which are consistent with the wounds that were inflicted on Matthew Johnson. And, additionally, Jonathan Herrera has described, in his testimony, the handle appeared black to him when he saw it. At least one of those knives has a black handle." Later during rebuttal argument, the prosecutor remarked, "What do we know about these knives independently? We know that Luis Villa ordered both of these knives. Okay. So, we know he has knives at some point prior to the time of the homicide. They were ordered before the time of the homicide, shipped to that house. The pathologists agree that three out of those four wounds were consistent with that. They only differ on one. [¶] . . . [¶] Reasonable minds can differ. Just keep in mind it's a paid defense expert who thinks one of them is a little too much of a stretch, apparently by four millimeters."

In sum, it is inarguable that the packing slips and related evidence, which demonstrated that appellant had obtained two folding knives shortly before the killing that were similar to the knife witnesses said was used in the stabbing, provided objective, corroborative evidence of appellant's involvement and significantly strengthened the prosecution's case. For these reasons, we conclude defense counsel's failure to object to admission of the two packing slips on hearsay grounds "undermine[s] confidence in the

---

[17] The defense's introduction of the replica knives into evidence was also plainly part of its effort to respond to the packing slip evidence by attempting to demonstrate that the blades of those knives were too wide to have been used in the stabbing.

35

outcome" of this case, which requires reversal of the judgment.  (See *Strickland*, *supra*, 466 U.S. at p. 694.)[18]

## DISPOSITION

The judgment is reversed.

---

[18] In light of this result, we do not address appellant's additional claims on appeal regarding (1) the trial court's failure to instruct on the heat of passion theory of voluntary manslaughter, and (2) the claim that appellant's sentence of 36 years to life constituted cruel and unusual punishment.

_____
Kline, P.J.

We concur:


_____
Richman, J.


_____
Stewart, J.